**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| THE TRULAND GROUP, INC., | ) | Case No. 14-12766-BFK |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| H. JASON GOLD, | ) | |
| IN HIS CAPACITY AS TRUSTEE FOR | ) | |
| THE TRULAND GROUP, INC., ET AL., | ) | Adversary Proceeding |
| | ) | No. 16-01151-BFK |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MYERS CONTROLLED POWER, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter came before the Court on the Defendant's Motion for Summary Judgment and Memorandum in Support. Docket Nos. 33, 34. The Plaintiff filed an Opposition to the Motion. Docket No. 41. The Defendant filed a Reply Memorandum. Docket No. 42. The Court heard the arguments of the parties on October 31, 2017.

This adversary proceeding is brought by the Chapter 7 Trustee of Truland Walker Seal Transportation, Inc. ("TWST") against a supplier of electrical equipment, Myers Controlled Power, LLC ("Myers"), for the avoidance and recovery of an alleged preference under Section 547 of the Bankruptcy Code. 11 U.S.C. § 547(b). Alternatively, the Trustee seeks to avoid and recover the payment under Section 548(a)(1)(B) of the Code, alleging that the payment to Myers was for less than reasonably equivalent value, at a time when the Debtor was insolvent or had an unreasonably small capital to operate its business. 11 U.S.C. § 548(a)(1)(B).

1

For the reasons stated below, the Court finds that Myers has not met its burden to show that there was a contemporaneous exchange for new value under Section 547(c)(1) of the Code when it released certain electrical equipment in exchange for the payment from the Debtor (the focus here being whether the exchange was truly "contemporaneous"). The Court finds, on the other hand, that there is no genuine dispute that the release of the equipment was reasonably equivalent value for the payment made under Section 548(a)(1)(B). Accordingly, the Court will: (a) deny the Defendant's Motion on Count I, the Preference Count; and (b) grant the Defendant's Motion on Count II, the Section 548(a)(1)(B) Count.

## Undisputed Facts

The Court finds that the following facts are not genuinely in dispute.

1. TWST was one of a group of affiliated companies doing business under the name "Truland." Truland and its affiliates comprised one of the largest electrical contractors in the United States, with very substantial contracts, including the federal government's Utah Data Center project, the Marriott Marquis in Washington, D.C., and the job that gave rise to this adversary proceeding, the Rehabilitation of the Orange/Blue Line – Stadium Armory to National Airport – for the Washington Metropolitan Area Transit Authority (WMATA).

    A. *The Parties' Contractual Arrangements.*

2. In January 2011 TWST, as Subcontractor, entered into a Subcontract Agreement with Clark Construction Group, LLC ("Clark") as the prime contractor on the Orange/Blue Line job. Motion, Ex. A. The total sum to be paid under the Subcontract was $45,000,000.00. *Id.*, ¶ 4(a).

3. Partial payments of 95% of the approved work and for on-site stored materials were permitted under the Subcontract. *Id.*, ¶ 4(b).

4.  The Subcontract contained what is generally known as a "flow down" provision, meaning that TWST as a Subcontractor was contractually obligated to pay its subcontractors and suppliers, and to avoid any bond claims against the surety that guaranteed TWST's performance. *Id.,* ¶ 4(c).

5.  Myers did not subcontract directly with TWST. Rather, Myers entered into a Supplier Subcontract with Nationwide Electrical Services, Inc. ("NES") for services and equipment. Motion, Ex. D. The total amount to be paid under the Myers-NES Supplier Subcontract was $17,041,113.00. *Id*., ¶ 4. The Myers-NES Supplier Subcontract contained a flow down provision similar to the one in the Clark-TWST Subcontract. *Id*., ¶ 3.

6.  Myers and the Trustee dispute whether there was ever a written subcontract between NES and TWST. The Trustee asserts that there was a subcontract, but is unable to locate or produce one. Whether or not there was a written subcontract between NES and TWST is, in the Court's view, immaterial to the outcome of this dispute.

   B.  *The Joint Check Agreement.*

7.  By the spring of 2014, Truland and its affiliates were significantly "out of trust" with their suppliers, meaning that they were receiving payments from general contractors but were not paying the suppliers and subcontractors in violation of the flow down provisions of their subcontracts. Charles Goldstein, who had been hired as Truland's Chief Restructuring Officer, concluded that as of March 31, 2014, the out of trust balance was approximately $23.7 million. Motion, Ex. M.

8.  On April 29, 2014, one of Truland's officers noted in an e-mail that TWST was "on payment hold from Clark so joint checks is a possibility as they are not otherwise paying us

until we can provide clear lien releases." Motion, Ex. I, at 1 (Chuck Tomasco e-mail, Apr. 29, 2014).

9. Chuck Tomasco noted on May 1, 2014, that "MCP [Myers Controlled Power] has currently stopped delivering equipment which will delay the entire project and jeopardize the $28M K-Line change order we're awaiting from WMATA/Clark . . . [W]e have also requested that Clark issue them payment via joint check but have not confirmed yet." *Id*. at 3 (Chuck Tomasco e-mail, May 1, 2014).

10. Myers refused to release the equipment to TWST. *Id.* at 7 (Sanchez e-mail, May 7, 2014) ("[W]e have had to stop testing and shipments of the ABB transformers. Presently six (6) transformers are ready for shipment.")

11. Myers requested "one party" checks from Clark, that is, checks payable only to Myers. Motion, Ex. J, at 5 (Sanchez e-mail to Clark, May 7, 2014). Myers also requested a payment guarantee from Clark. *Id.*

12. Clark, as the prime contractor, insisted on a joint check arrangement. Motion, Ex. J, at 11 (Breeden e-mail, May 13, 2014) ("Clark will issue Joint Checks to MCP/Truland that will be endorsed by Truland and then sent to MCP by Clark.")

13. On June 9, 2014, Clark, Myers and TSWT entered into a Joint Check Agreement ("JCA"). Motion, Ex. L.

   *C. Myers Explores Making a Payment Claim on the Bond.*

14. As the negotiations for the Joint Check Agreement proceeded in May 2014, Myers began exploring the process of making a claim against Fidelity and Deposit Company of Maryland/Zurich American (together, "Zurich"), Truland's bonding company on the Orange/Blue Line job. Motion, Ex. H.

4

15. Myers never made a formal claim on the bond. Rather, Zurich signed off on the Joint Check Agreement, and no payment was made on the surety bond. Motion, Ex. J, at 14-16.[1]

D. *The Payment and the Release of the Equipment.*

16. On May 27, 2014 (about two weeks before the JCA), Myers, satisfied with Clark's representations that it would enter into a JCA, released equipment with a cost of $1,819,206.31. Motion, Ex. O, at 1. This invoice included $181,920.63 in "Overhead/Profit," for a total of $2,001,126.94. *Id.*

17. On June 18, 2014 (nine days after the parties signed the JCA), Myers released additional equipment with a cost of $261,667.00. *Id.* at 9. The June 18th Bill of Sale included an additional $26,166.70 for "Overhead/Profit," for a total Invoice of $287,833.70. *Id.*

18. On July 11, 2014, Clark delivered a check (No. 10101212) to TWST in the amount of $2,197,039.86. Motion, Ex. N. The check was payable jointly to Myers and TWST. *Id.*

19. TWST endorsed the check and had it delivered back to Clark. Clark then forwarded the check to Myers. Motion, Ex. B, at 44-45.

E. *Truland and its Affiliates file for Bankruptcy Protection.*

20. TWST filed a voluntary petition under Chapter 7 with this Court on July 23, 2014. Case No. 14-12774-BFK.

21. The case is being jointly administered (but not substantively consolidated) with the Chapter 7 cases of The Truland Group, Inc., and its subsidiaries, in Case No. 14-12766-BFK. Case No. 14-12766-BFK, Docket No. 150.

22. The Trustee filed this Adversary Proceeding on July 21, 2016. Docket No. 1.

---

[1] On June 22, 2015, NES made a demand for payment on the surety bond in the amount of $144,197.42, "as a fee for handling the material." Reply Mem., Ex. B.

5

**Conclusions of Law**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. 1334 and the Order of Reference entered by the U.S. District Court for this District on August 15, 1984. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(F) (proceedings to determine, avoid or recover preferences) and (H) (proceedings to determine, avoid or recover fraudulent transfers).

Summary judgment is appropriate where there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56). The moving party has the initial burden of showing that there are no material facts in dispute, and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24 (1986). When the moving party has met its initial burden, the burden then shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986).

Whether a fact is material or not depends on the substantive law at issue in the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. Rule Civ. Proc. 1). The Court must view the facts and the inferences reasonably drawn therefrom in the light most favorable to the non-moving party. *United States v. Carolina Transformer Co.,* 978 F.2d 832, 835 (4th Cir. 1992).

Case 16-01151-BFK   Doc 45   Filed 01/08/18   Entered 01/08/18 14:50:53   Desc Main
                           Document      Page 7 of 20

**I.  Count I – Alleged Preferential Transfer (11 U.S.C. § 547(b)).**

Section 547(b) of the Code provides that the trustee may avoid "any transfer of an interest of the debtor in property" that is:

(1)  to or for the benefit of a creditor;

(2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3)  made while the debtor was insolvent;

(4)  made—

(A)  on or within 90 days before the date of the filing of the petition; or

(B)  between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5)  that enables such creditor to receive more than such creditor would receive if—

(A)  the case were a case under chapter 7 of this title;

(B)  the transfer had not been made; and

(C)  such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

There is no question that there was a transfer to Myers within the 90 days preceding the bankruptcy case. There also is no question that TWST was insolvent during the 90-day preference period. *See* 11 U.S.C. § 547(f) (rebuttable presumption of insolvency). The issue is whether there was a transfer of the Debtor's (TWST's) property. Alternatively, Myers argues that it has an affirmative defense that the transfer was a substantially contemporaneous exchange for new value under Section 547(c)(1). First, though, the Court must explore the issue of whether Myers was a creditor of TWST with an antecedent debt for purposes of Section 547.

### A. Was Myers a Creditor?

Section 547(b) allows the Trustee to avoid transfers "to or for the benefit of a creditor," "for or on account of an antecedent debt." 11 U.S.C. § 547(b)(1)-(2). Myers argues that it had no contract directly with the Debtor, and therefore cannot be considered to be a creditor. The term "creditor" is defined as one with a claim against the Debtor. 11 U.S.C. § 101(10)(A). The term claim is defined as any right to payment, whether "liquidated, unliquidated, fixed, contingent, matured or unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A).[2]

The Trustee responds that there was one Invoice, dated July 18, 2014, from Myers directly to Truland Corporation in the amount of $113,200.00. Trustee's Opposition, Ex. 1. Myers argues that this invoice was only for testing of the equipment and for storage fees engendered when Myers was required to store the equipment while the JCA was being negotiated. Even without this Invoice, though, Myers would have had a claim in *quantum meruit* against TWST for the value of the equipment it delivered on May 27 and June 18, 2014, and for which it was not paid until July 11, 2014. Moreover, both TWST and Myers were parties to the JCA. As of the delivery dates for the equipment, Myers had a contingent claim against TWST under the JCA.[3]

---

[2] Myers' position here is inconsistent with its position that the Clark-TWST Subcontract created a trust for its benefit, discussed below. Where there is a trustee-beneficiary relationship and the trustee (here, TWST) defaults in its fiduciary duties to the beneficiary, the beneficiary has a claim for damages against the trustee. *See* 11 U.S.C. § 523(a)(4) (nondischargeability of claims for defalcation while acting in a fiduciary capacity).

[3] Myers certainly took the position that TWST owed it money when it began exploring making the bond claim. *See* Motion, Ex. H, at 4 (Grootonk [Myers] e-mail, May 14, 2014: "Please restart the process of filing against Truland's payment bond for the $1.4M that Clark paid Truland but Truland has not paid Myers.")

Taking the evidence in the light most favorable to the non-moving party, here the Trustee, the Court finds that Myers was a creditor of TWST at the time that the transfer was made on July 11, 2014.

### B. Do the Proceeds of the Check Constitute Property of the Estate?

Section 547(b) allows the Trustee to avoid transfers of the debtor's interest in property. 11 U.S.C. § 547(b). Section 541(d), on the other hand, provides that property to which the debtor has bare legal title, held in trust for another, is not property of the estate. 11 U.S.C. § 541(d); *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron),* 155 F.3d 718, 721-22 (4th Cir.1998) ("[W]hen a 'debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate' for purposes of the Bankruptcy Code.") (citing *Begier v. IRS,* 496 U.S. 53, 59 (1990)). This principle limits the ability of a trustee to avoid transfers of property that the debtor held in trust for another. *See, e.g., Holmes Envtl., Inc. v. SunTrust Banks, Inc. (In re Holmes Envtl., Inc.),* 287 B.R. 363, 382 (Bankr. E.D. Va. 2002) ("Here the funds in the escrow account representing the monies earned by the performance of Hazmed on the Corps Contract are not estate property; therefore, no preference can occur.")

Myers makes two arguments as to why the proceeds of the joint check were not property of the estate.

### (i) The Clark-TWST Subcontract.

Myers argues first that the flow down provision contained in the Clark-TWST Subcontract created a trust for its benefit. Motion, at 6-7 ("The Clark Subcontract created an implied trust whereby TWST was contractually required to remit payments to its subcontractors"). The Court finds, however, that the flow down provision in the Clark-TWST Subcontract lacks the characteristics of a trust. *See Racetrac Petroleum, Inc. v. Khan (In Re*

9

*Khan),* 461 B.R. 343, 348 (E.D. Va. 2011) (three primary indicia of an intent to create a trust: (a) the designated trustee lacks legal title to the property; (b) the trustee is restricted in its use of the property; and (c) the property remains separate from the trustee's own property) (citing *In re Strack*, 524 F.3d 493, 499 (4th Cir. 2008)). The flow down provision in the Clark-TWST has none of these attributes.

Absent the JCA, the funds would have been TWST's property upon receipt. There was no requirement in the Subcontract for the segregation of the funds. A violation of the flow down provision by TWST would have given rise to an ordinary breach of contract claim or a *quantum meruit* claim and nothing more.

The flow down provision in the Clark-TWST Subcontract did not create a trust.

    *(ii)*    *The Joint Check Agreement.*

Myers' second argument in favor of a trust relies on the JCA and the Fourth Circuit's decision in *Mid-Atlantic Supply, Inc. of Virginia v. Three Rivers Aluminum Co.,* 790 F.2d 1121 (4th Cir. 1986). The *Mid-Atlantic* case involved a dispute between a lower-tier supplier (TRACO) and a lender with a security interest in the Debtor's accounts receivable (United Virginia Bank). TRACO sought relief from the automatic stay with respect to a joint check payable to TRACO and the Debtor. *Id.* at 1122. The Court granted the motion and the Debtor appealed. The case was then converted to Chapter 7, and the Chapter 7 Trustee abandoned any interest in the check. United Virginia Bank then moved to intervene, claiming a security interest in the check and its proceeds. *Id.* at 1123. The bankruptcy court held in favor of TRACO, and the Bank appealed. *Id.*

The Fourth Circuit held that under the joint check arrangement the Debtor "had not the slightest interest in the check," and that there was a constructive trust in favor of TRACO. *Id.* at

1127. The Fourth Circuit described the Debtor's (Mid-Atlantic's) position as that of a "mere conduit," under which its function "was solely to indorse the joint check and pass it on to TRACO as TRACO's property." *Id.* Although the *Mid-Atlantic* case involved a dispute between a supplier and a secured party, its holding has been applied in the context of preference cases. *See e.g., In re Railworks Corp.,* 387 B.R. 156, 164-67 (Bankr. Md. 2008); *In re Diamond K Corp.*, No. 04-50356, 2007 WL 2229727, at *3-4 (Bankr. E.D. Tex. 2007).

The Trustee attempts to distinguish *Mid-Atlantic* by arguing that under the Virginia Uniform Commercial Code, both TWST and Myers had a legal interest in the check. Va. Code § 8.3A-110(d).[4] If TWST sought to enforce the instrument, though, it would have been subject to Clark's contractual defense under the JCA that it intended to pay Myers, not TWST. Va. Code § 8.3A-305(a)(2). Further, the UCC is clear that one taking an instrument other than a holder in due course "is subject to a claim of a property or possessory right in the instrument or its proceeds." Va. Code § 8.3A-306. *See also* Va. Code § 8.1A-103(b) ("Unless displaced by the particular provisions of the UCC, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions.") TWST did not occupy the position of a holder in due course because it took the instrument with full knowledge of the JCA, and hence, was subject to both

---

[4] Section 8.3A-110(d) states as follows:

> If an instrument is payable to two or more persons alternatively, it is payable to any of them and may be negotiated, discharged, or enforced by any or all of them in possession of the instrument. If an instrument is payable to two or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced only by all of them. If an instrument payable to two or more persons is ambiguous as to whether it is payable to the persons alternatively, the instrument is payable to the persons alternatively.

Va. Code § 8.3A-110(d).

Myers' rights to the proceeds and Clark's defense to pay anyone other than Myers. Va. Code § 8.3A-302(a)(2) (holder in due course must take "without notice of any claim to the instrument" and "without notice that any party has a defense or claim in recoupment.") The Trustee's argument under Virginia Uniform Commercial Code Section 8.3A-110(d), therefore, does not supplant the holding of *Mid-Atlantic*.

The Trustee further responds to the *Mid-Atlantic* joint check argument by asserting that the JCA itself was executed on June 9, 2014, within the 90-day preference period. This is a more forceful argument. The Trustee cites *In re R.J. Patton Co., Inc.*, 348 B.R. 618 (Bankr. D. Conn. 2006), and *In re Buono,* 119 B.R. 498 (Bankr. W. D. Pa. 1990), for the proposition that where a joint check agreement is entered into within the 90 days, the agreement is a preference. *See Patton*, 348 B.R. at 625 ("When the Defendant signed the JPA's and simultaneously accepted the Joint Checks, the Debtor's interest in the Receivables was transferred to the Defendant and that *was* a transfer of property of the Debtor within the preference period") (emphasis in original); *Buono*, 119 B.R. at n.1. Here, the Trustee has the better argument. There was no joint check arrangement from the outset of the parties' dealings. The parties entered into the JCA after TWST was in default, after Myers refused to release the equipment, and within the 90-day preference period. Myers unquestionably improved its position when it entered into the JCA with Clark and the Debtor.[5]

The Court finds that the JCA and the joint check issued pursuant to that agreement constitute a preference – subject to Myers' contemporaneous exchange for new value defense, discussed below.

---

[5] The JCA fits comfortably within the definition of a "transfer," in that it was a "mode, direct or indirect, absolute or conditional, voluntary or involuntary of disposing of or parting with – (i) property; or (ii) and interest in property." 11 U.S.C. § 101(54)(D). Myers' position is that, by virtue of the JCA, TWST parted with all interest in the proceeds of the check.

12

### C. Myers' Defense Under Section 547(c)(1) (Substantially Contemporaneous Exchange for New Value).

Section 547(c)(1) provides a defense to preference liability where the transfer is a substantially contemporaneous exchange for new value. 11 U.S.C. § 547(c)(1). Section 547(c)(1) is intended "'to encourage creditors to continue to deal with troubled debtors' by 'prevent[ing] trustees from avoiding payments that were clearly intended to support a new transaction, instead of an antecedent debt.'" *In re ESA Envtl. Specialists, Inc.,* 709 F.3d 388, 397-98 (4th Cir. 2013) (quoting *United Rentals, Inc. v. Angell (In re United Rentals),* 592 F.3d 525, 529 (4th Cir. 2010)). The party asserting the new value defense has the burden of proof. *Id.* The key question is "whether the alleged preferential transfer diminished the debtor's estate, i.e., whether the debtor in fact acquired a new asset that offset the loss in value to the estate when the debtor transferred existing assets to acquire the new asset at issue." *Id.* at 398.

Myers posits that it is entitled to the new value defense in two ways: (a) the release of its bond claim against Zurich; and (b) the release of the equipment that it was holding prior to the payment. The Court will examine both claims.

### (i)    Myers' Alleged Release of its Bond Claim.

Myers first claims that it released a bond claim against Zurich, which benefited the Debtor. *See GEM Constr. Corp. of Virginia*, 262 B.R 638, 652 (Bankr. E.D. Va. 2000). As noted above, though, Myers began investigating making a bond claim against the surety bond, but it never actually made a bond claim. Rather, the parties – including Zurich – entered into the JCA, thereby making any claim under the bond unnecessary. *See* Def.'s Mem., at 5 ("In May 2014, Myers contacted Zurich Insurance Company, TSWT's bonding company, regarding non-payments"); Def.'s Reply Mem., at 17 ("Myers was in the process of making a bond claim with Zurich.")

13

The situation, then, is indistinguishable from *United Rentals* where the Fourth Circuit rejected a new value defense based on the release of "inchoate" rights to make a bond claim. 592 F.3d at 532 ("Since United never even attempted to make any claim on the bond here, the Surety never obtained any lien that it could release.") The Court finds that Myers never actually made a bond claim, and therefore, did not release a bond claim as new value to the Debtor.

      (ii)    *Myers' Delivery of the Equipment.*

Myers argues in the alternative that it provided new value based on the release of the equipment. Myers released equipment with a value of $1,819,206.31, plus Overhead/Profit of $181,920.63, on May 27, 2014, in anticipation of the JCA and the delivery of a joint check from Clark. Motion, Ex. O, at 1. It released an additional $261,667.00 in equipment on June 18, 2014, plus Overhead/Profit of $26,166.70. *Id.* at 9.

The Trustee argues that the evidence fails to establish that the parties mutually intended the release of the equipment to be a substantially contemporaneous exchange for new value. *See* 11 U.S.C. § 547(c)(1)(A) ("[T]o the extent that such transfer was intended by the debtor and the creditor . . . to be a contemporaneous exchange for new value"). The parties' intent may be "gleaned from, *inter alia,* 'the agreement or the course of dealings between the parties.'" *In re Holmes Environmental, Inc.,* 287 B.R. 363, 385 (Bankr. E.D. Va. 2002) (quoting *Everlock Fastening Sys., Inc. v. Health All. Plan (In re Everlock Fastening Sys., Inc.),* 171 B.R. 251, 255 (Bankr. E. D. Mich. 1994)). It is clear in this case that Myers had no intention of releasing its equipment without the JCA being put into place. It released the equipment with the full expectation that Clark would issue a joint check. The Court finds that Myers' evidence of the parties' intent, through the e-mail exchanges that took place in anticipation of the JCA,

14

establishes a mutual intent to create a substantially contemporaneous exchange for new value. Motion, Ex. I, at 1-2 (Hinton emails, Apr. 28, 2014 and Apr. 29, 2014).

Was the exchange in fact substantially contemporaneous? *See* 11 U.S.C. § 547(c)(1)(B) ("[I]n fact a substantially contemporaneous exchange"). The Court finds that it was not. The "substantially contemporaneous" standard is a flexible one, requiring the Court to take into account the particular facts and circumstances of each case. *In re Genmar Holdings, Inc.,* 776 F.3d 961, 964 (8th Cir. 2015) (citing *In re Dorholt*, 224 F.3d 871, 874 (8th Cir. 2000) (quotation omitted)); *In re Hedrick*, 524 F.3d 1175, 1190 (11th Cir. 2008).

Other courts have found the delivery of goods to be substantially contemporaneous where the goods are delivered within roughly two weeks of the transfer. *Pine Top Ins. Co. v. Bank of America Nat. Trust & Sav. Ass'n,* 969 F.2d 321, 328 (7th Cir. 1992) (delay of two to three weeks); *In re Payless Cashways, Inc.*, 306 B.R. 243, 252 (8th Cir. B.A.P. 2004) (payment for goods by EFT within 15 days of delivery); *Matter of Anderson-Smith Assocs.,* 188 B.R. 679, 689 (Bankr. N.D. Ala. 1995) (nine-day delay; "A transaction can be substantially contemporaneous even where there is some separation between the events of the extension of new value and the transfer by the debtor") (citing *In re Kiddy Toys, Inc.*, 178 B.R. 928, 936 (Bankr. D. P.R. 1994)).

Somewhat longer periods of time, on the other hand, have been held not to be substantially contemporaneous. *In re Furr's Supermarkets, Inc.,* 485 B.R. 672, 738 (Bankr. N.M. 2012) (checks for insurance premiums provided "at least two months" after coverage provided by insurer deemed not substantially contemporaneous); *In re Interstate Bakeries Corp.*, No. 04-45814, 2012 WL 6614969, at * 5 (Bankr. W.D. Mo. Dec. 19, 2012) (average delay of 31 days not substantially contemporaneous); *In re Messamore*, 250 B.R. 913 (Bankr. S.D. Ill. 2000) (delay of 50 days not substantially contemporaneous); *In re McLaughlin*, 183 B.R. 171, 176

(Bankr. W.D. Wis. 1995) (32 days from attachment to perfection of a security interest not substantially contemporaneous); *In re Freestate Management Services, Inc.*, 153 B.R. 972, 984 (Bankr. D. Md. 1993) (delay of 24 days not substantially contemporaneous); *In re Arctic Air Conditioning, Inc.,* 35 B.R. 107, 109 (Bankr. E. D. Tenn. 1983) (30 days not substantially contemporaneous).

In this case, the vast majority of the equipment ($1,819,206.31) was released on May 27th, 44 days (over six weeks) before the payment on July 11th by joint check. The lesser amount of equipment ($261,667.00) was released on June 18th, 23 days (three weeks and two days) before the joint check was issued on July 11th. The Trustee is correct in his argument that the execution of the JCA was a preference, so Myers cannot rely on the JCA as a defense under *Mid-Atlantic*. The Court finds that a gap of 44 days, and a gap of 23 days, are simply too long to be considered truly "contemporaneous" under Section 547(c)(1).

For these reasons, the Court finds that Myers has not established a defense to liability under Section 547(c)(1) of the Code. The Court will deny Myers' motion for summary judgment on Count I.[6]

## II. Count II – Constructively Fraudulent Transfer (11 U.S.C. § 548(a)(1)(B)).

In Count II, the Trustee argues in the alternative that the payments are avoidable as constructively fraudulent transfers because Myers received a payment from TWST for which TWST was not legally obligated. 11 U.S.C. § 548(a)(1)(B) (transfers for "less than reasonably equivalent value" avoidable where accompanied by insolvency or unreasonably small capital).

---

[6] Myers also asserts an "earmarking" defense on Count I. The earmarking defense does not apply here because Clark did not extend a loan to TWST to repay a debt to Myers. Rather, Clark was paying outstanding invoices to TWST under a joint check arrangement. *See ESA Envtl. Specialists, Inc.,* 709 F.3d at 396 ("The earmarking doctrine applies only when the debtor borrows money from one creditor and the terms of that agreement require the debtor to use the loan proceeds to extinguish specific, designated, existing debt.")

Myers responds with the same argument as above, that the transfer was made pursuant to the JCA and, therefore, the proceeds of the joint check were not property of the Debtor's estate. This argument is problematic, though, because as the Court finds above, the JCA itself was a preference.

More to the point, however, the release of the equipment constituted value to TWST for purposes of Section 548(a)(1)(B). Specifically, Myers released the equipment, thereby satisfying TWST's contractual obligation to Clark to supply the goods. The term "value" is defined for purposes of Section 548 to include the satisfaction of an antecedent debt. 11 U.S.C. § 548(d)(2)(A). The Fourth Circuit has adopted the "indirect benefit" theory, where "if the giving of the consideration to [a] third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and [the statute] has been satisfied—provided of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up." *In re Jeffrey Bigelow Design Grp., Inc.,* 956 F.2d 479, 485 (4th Cir. 1992) (quoting *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991-92 (2d Cir. 1981)).

Here, TWST paid Myers with funds from Clark, and Myers satisfied TWST's contractual obligation to deliver the equipment to Clark. The value of the equipment approximates the amount of the payment. Under Section 548(a)(1)(B), the value provided need not be substantially contemporaneous with the transfer. *In re Bulmer*, No. 15-3116-RLM-7A, 2017 WL 562436, at *5 (Bankr. S. D. Ind. 2017); *In re Kenrob Info. Tech. Sols., Inc.,* 474 B.R. 799, 803 (Bankr. E. D. Va. 2012). The release of the equipment in this case constituted reasonably equivalent value in that it satisfied TWST's contractual obligation to deliver the equipment to Clark.[7]

---

[7] Myers did not raise the indirect benefit argument in its papers. Rather, it argued that the Trustee's fraudulent transfer claim lacked plausibility because Myers was paid with a joint check. Myers did, however, raise the new value issue in response to Count I in arguing that "Myers also provided new value in the form of releasing materials it was withholding for the WMATA project." Def.'s Reply Mem., at 19. In the Court's view, the indirect benefit

The Trustee argues that the amount of the check ($2,107,039.86) is roughly $26,000.00 more than the value of the equipment as stated on the two Invoices, excluding overhead and profit (the two invoices total $2,080,873.31 for the equipment only). Myers acknowledges the difference in its Reply Memorandum. Reply Mem., at 19 ("[T]he joint check was for specific Myers' invoices . . . plus, the additional amount of $26,386.54"). The simple answer is that the amount of the check is equal almost to the penny to the amount of the two invoices *including* the profit and labor on the second invoice ($26,166.70), but *excluding* the profit and labor on the first invoice ($181,920.63), which comes out to a total of $2,107,040.01, a difference of fifteen cents. It appears, therefore, that Clark agreed to pay the Overhead/Profit number on the second invoice (at the time, Myers was threatening to charge for storage of the equipment). The Court is not aware of any case law that excludes profit and overhead in determining whether reasonably equivalent value was provided under Section 548(a)(1)(B). *See In re LandAmerica Fin. Grp., Inc. v. S. California Edison Co. (In re LandAmerica Fin. Grp., Inc.),* 525 B.R. 308, 316 (Bankr. E.D. Va. 2015) ("In determining 'reasonably equivalent value,' it is therefore unnecessary to 'demand a precise dollar-for-dollar exchange'") (citing *Bakst v. U.S. (In re Kane & Kane),* 479 B.R. 617, 628 (Bankr. S. D. Fla. 2012)).[8]

The Court will, therefore, grant summary judgment to the Defendant on Count II.

---

issue is substantially similar to Myers' new value argument on Count I. The difference, as noted above, is that under Section 547(c)(1) the new value must be substantially contemporaneous with the transfer, while under Section 548(a)(1)(B), the value provided need not be contemporaneous.

[8] The exception would be for fictitious profits in the Ponzi scheme context. *In re Bernard Madoff Securities LLC,* 458 B.R. 87, 111 (Bankr. S.D. N.Y. 2011). Unlike the debtors in the Ponzi scheme cases, the Debtor in this case was legally obligated to pay the profit and overhead components to Myers, and this case does not involve allegations of actually fraudulent conduct under Section 548(a)(1)(A) and corresponding state law.

### III. The Remaining Counts in the Complaint.

The remaining Counts in the Complaint are: Count III (Unauthorized Post-Petition Transfer - 11 U.S.C. § 549), Count IV (Recovery of Property – 11 U.S.C § 550) Count V (Preservation of Avoidance – 11 U.S.C. § 551), and Count VI (Disallowance of Claim – 11 U.S.C. § 502(d)). Count III fails because there was no post-petition transfer in this case. The Court, therefore, will dismiss Count III.

Counts IV, V and VI all depend on the avoidance of the transfer under Counts I or II, which the Court holds above may be avoided under Count I. The Court, therefore, will deny the Defendant's Motion on Counts IV, V and VI.

### Conclusion

For the foregoing reasons the Court will enter a separate Order under which:

A.  The Court will deny the Defendant's Motion for Summary Judgment on Counts I, IV, V and VI.

B.  The Court will grant Defendant's Motion for Summary Judgment on Count III.

C.  The Court will grant the Defendant's Motion for Summary Judgment on Count II.

D.  The Clerk will mail a copy of this Memorandum Opinion and the accompanying Order, or will provide cm-ecf notice of their entry, to the parties below.

Date: Jan 8 2018

Alexandria, Virginia

/s/ Brian F. Kenney
Brian F. Kenney
United States Bankruptcy Judge

Entered on Docket: January 8, 2018

<u>Copies to</u>:

Dylan G. Trache
101 Constitution Avenue, N.W., Suite 900
Washington, D.C. 20001
*Counsel for the Plaintiff*

Jennifer McLain McLemore
909 East Main Street, Suite 1200
Richmond, VA 23219
*Counsel for the Defendant*

James M. McHugh
220 Market Avenue, South, Eighth Floor
Canton, Ohio 44702
*Counsel for the Defendant*