**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| THE TRULAND GROUP, INC., | ) | Case No. 14-12766-BFK |
| | ) | Chapter 7 |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| H. JASON GOLD, | ) | |
| IN HIS CAPACITY AS TRUSTEE FOR | ) | |
| THE TRULAND GROUP, INC., ET AL., | ) | Adversary Proceeding |
| | ) | No. 16-01151-BFK |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MYERS CONTROLLED POWER, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This adversary proceeding is brought by the Chapter 7 Trustee of Truland Walker Seal

Transportation, Inc. ("TWST") against a supplier of electrical equipment, Myers Controlled

Power, LLC ("Myers"), for the avoidance and recovery of an alleged preference under Section

547 of the Bankruptcy Code. 11 U.S.C. § 547(b). The Court heard the evidence on February 1

and March 29, 2018. For the reasons stated below, the Court finds in favor of the Trustee.

**Findings of Fact**

The Court, having heard the evidence, makes the following findings of fact:

1.      TWST was one of a group of affiliated companies doing business under the name

"Truland." Truland and its affiliates comprised one of the largest electrical contractors in the

United States, with very substantial contracts, including the contract at issue in this case, the

1

Rehabilitation of the Orange/Blue Line – Stadium Armory to National Airport – for the

Washington Metropolitan Area Transit Authority (WMATA).

     *A.   The Parties' Contractual Arrangements.*

     2.     Clark Construction Group, LLC ("Clark") was the General Contractor on the

Orange and Blue Line renovation contract for WMATA. The project was a $273 million

renovation, involving electrical upgrades, architectural upgrades, the installation of 26 kiosks and

mechanical upgrades and repairs.

     3.     In January 2011, TWST, as Subcontractor, entered into a Subcontract Agreement

with Clark Construction Group, LLC ("Clark") as the prime contractor on the Orange/Blue Line

job. The total sum to be paid under the Subcontract was $45,000,000.00. Def. Ex. A, at 2.

     4.     In connection with this contract, Truland caused its bonding companies, Fidelity

and Deposit Company of Maryland and Zurich American Insurance Company (together,

"Zurich"), to issue Performance Bonds and a Payment Bond on the job. Def. Ex. L, at 00014-

00019.

     5.     Partial payments were permitted under the Subcontract for 95% of the approved

work and for on-site stored materials. Def. Ex. A, at 2, ¶ 4(b).

     6.     The Subcontract contained what is generally known as a "flow down" provision,

meaning that TWST as a Subcontractor was contractually obligated to pay its subcontractors and

suppliers, and to avoid any bond claims against the surety that guaranteed TWST's performance.

*Id.,* ¶ 4(c).

     7.     At first, Truland intended to use Powell Electrical as a second-tier subcontractor

to supply the needed electrical equipment and switches. Powell's circuit breakers did not test

properly, however, and were rejected by WMATA. Truland ended up replacing Powell with Myers.

8.      Myers did not subcontract directly with TWST. Rather, Myers entered into a Supplier Subcontract with a Disadvantaged Business Entity ("DBE"), Nationwide Electrical Services, Inc. ("NES"), for services and equipment. Def. Ex. B. The total amount to be paid under the Myers-NES Supplier Subcontract was $17,041,113.00. *Id*. at1, ¶ 4. The Myers-NES Supplier Subcontract contained a flow down provision similar to the one in the Clark-TWST Subcontract. *Id*., ¶ 3.[1]

9.      The initial proposal from Myers was in the amount of $17,211,342.32. Def. Ex. D. This amount included $170,229.32 for payment and performance bonds. *Id.* In the end, the requirement for Myers to supply payment and performance bonds was dropped, so the price was reduced accordingly. Def. Ex. J.

10.      With the exception of one invoice for stored material, Myers sent its invoices to NES. Def. Ex. K.[2]

11.      NES sent invoices to TWST. Def. Ex. G. Most of the invoices state: "Billing for Myers Controlled Power." *Id.* The parties – TWST and Myers – considered these invoices to be a fee for "managing the Subcontract with Myers." Myers took its directions exclusively from TWST, not from NES.

12.      When it came time to pay for the equipment, Clark would issue joint checks to TWST and NES. Def. Exs. E, at 1061, 0164; F.

---

[1]  The Myers-NES Supplier Subcontract is not signed by either party. No one disputes, however, that the parties acted as though the Subcontract was in full force and effect.

[2] The one invoice not sent to NES was sent to Truland Transportation. Def. Ex. K, at 0144, Invoice No. 6042.

13.     Myers and the Trustee dispute whether there was ever a written subcontract between NES and TWST. The Trustee was unable to locate or produce one. The Court concludes that there was not a signed, written subcontract between NES and TWST.

*B. The Joint Check Agreement.*

14.     In April 2014, the Truland companies engaged Charles Goldstein, a Managing Director with Protiviti, to act as their Chief Restructuring Officer. Mr. Goldstein testified that by the spring of 2014, Truland and its affiliates were "out of trust" with their suppliers, meaning that they were receiving payments from general contractors but were not paying the suppliers and subcontractors in violation of the flow-down provisions of their subcontracts, by approximately $23.7 million. Def. Ex. T.

15.     On April 29, 2014, Charles Breeden of Clark stated: "It was brought to my attention this afternoon that MCP (Truland's DC Gear Supplier) has notified Truland that they will not proceed with additional work until old invoices have been paid." Def. Ex. O (Charles Breeden e-mail, Apr. 27, 2014).

16.     On May 1, 2014, Charles (Chuck) Tomasco of Truland noted that "MCP [Myers Controlled Power] has currently stopped delivering equipment which will delay the entire project and jeopardize the $28M K-Line change order we're awaiting from WMATA/Clark . . . [W]e have also requested that Clark issue them payment via joint check but have not confirmed yet." Pl. Ex. 16 (Chuck Tomasco e-mail, May 1, 2014).

17.     Myers refused to release the equipment to TWST. Pl. Ex. 17 (Sanchez e-mail, May 7, 2014) ("[W]e have had to stop testing and shipments of the ABB transformers. Presently six (6) transformers are ready for shipment.")

4

18.     In light of Truland's payment default, Myers requested "one party" checks from

Clark, that is, checks payable only to Myers, as well as a payment guarantee directly from Clark.

Pl. Ex. 18, at CCG 0014-0015 (Sanchez e-mail to Charles Breeden, May 7, 2014).

19.     On May 9, 2014, Clark formally notified Truland of its default owing to Truland's

failure to pay its suppliers and subcontractors. Def. Ex. O, at CCG 0005.

20.     Clark, as the prime contractor, insisted on a joint check arrangement. Pl. Ex. 20, at

0059 (Charles Breeden e-mail, May 13, 2014) ("Clark will issue Joint Checks to MCP/Truland

that will be endorsed by Truland and then sent to MCP by Clark.").

21.     A draft of a Joint Check Agreement ("JCA") (along with Joint Check Agreements

on other Truland projects) was circulated on June 11, 2014. Def. Ex. M.

22.     Clark, Myers and TWST entered into a Joint Check Agreement ("JCA"). Def. Ex.

P. Although it is dated June 9, 2014, the JCA was still unexecuted as of June 11th. *See* Pl. Ex. 39;

Def. Ex. N, at 0049. Rick Sanchez of Myers testified that Myers signed the JCA about a week

after June 9th, thereby putting the effective date of the JCA at about June 16th.

*C.  Myers Explores Making a Payment Claim on the Bond.*

23.     As the negotiations for the Joint Check Agreement proceeded in May 2014,

Myers began exploring the process of making a claim against Zurich, Truland's bonding

company on the Orange/Blue Line job. Def. Ex. L.

24.     Although Mr. Sanchez testified that Myers "commenced" making claims under

Truland's performance and payment bonds with Zurich, no bond claim was entered into

evidence.

25.     The Court, therefore, concludes that Myers never made a formal claim on the bond. Rather, Zurich signed off on the Joint Check Agreement. Def. Ex. P.[3]

*D.  The Payment and the Release of the Equipment.*

26.     On May 27, 2014, Myers, satisfied with Clark's representations that it would enter into a JCA, released equipment with a cost of $1,819,206.31. Def. Ex. R, at 001123. This invoice included $181,920.63 in "Overhead/Profit," for a total of $2,001,126.94. *Id.*

27.     On June 18, 2014, Myers released additional equipment with a cost of $261,667.00. *Id.* at 001268. The June 18th Bill of Sale included an additional $26,166.70 for "Overhead/Profit," for a total Invoice of $287,833.70. *Id.*

28.     On July 11, 2014, Clark delivered a check (No. 10101212) to TWST in the amount of $2,107,039.86. Def. Ex. Q. The check was payable jointly to Myers and TWST. *Id.*

29.     TWST endorsed the check and had it delivered back to Clark. Clark then forwarded the check to Myers.

*E.  Truland and its Affiliates file for Bankruptcy Protection.*

30.     By mid-July 2014, Truland was planning for a bankruptcy filing. Def. Ex. U. By that point, the Orange and Blue Line contract was approximately 40% complete, with a $2.8 million account receivable in favor of TWST. *Id.* at 000463.[4]

---

[3] Myers attempted to introduce evidence of a bond claim at the continued hearing on March 29th. The Court excluded the proffered evidence on the ground that it constituted unfair surprise and prejudice to the Plaintiff. The parties had ten months of discovery in this adversary proceeding, from the time that Myers filed its Answer in October 2016, to August 31, 2017. Docket No. 28. The Court extended the discovery cutoff, at the joint request of the parties. Docket No. 28. The Court's Final Scheduling Order required that Exhibits be filed and exchanged by January 18, 2018. Docket No. 40. The Court continued the trial for a month at Myers' request, to accommodate its witness Mr. Sanchez. The purported bond claim would have been in Myers' possession before the adversary proceeding was filed.

[4] During this period of time – late Spring to early Summer 2014 – Myers was interested in purchasing Truland. At first, Myers was interested in purchasing all of Truland; later, it pared its interest down only to TWST. Def. Ex. V, at 00000766. Myers advanced $250,000.00 so that TWST could make payroll. *Id* ("Truland is currently providing additional information to Myers Power Products, Inc. based on their interest in purchasing the Transportation

31.     TWST filed a voluntary petition under Chapter 7 with this Court on July 23, 2014. Case No. 14-12774-BFK.

32.     The case is being jointly administered (but not substantively consolidated) with the Chapter 7 cases of The Truland Group, Inc., and its subsidiaries, in Case No. 14-12766-BFK. Case No. 14-12766-BFK, Docket No. 150.

33.     The Trustee filed this Adversary Proceeding on July 21, 2016. Docket No. 1.

34.     The Trustee testified without contradiction that it is "extraordinarily unlikely" that there will be a distribution to the general unsecured creditors in the case. He testified that administrative creditors will be paid in full, and there will be some distribution to priority creditors, but unsecured creditors will not receive a distribution.

**Conclusions of Law**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. 1334 and the Order of Reference entered by the U.S. District Court for this District on August 15, 1984. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(F) (proceedings to determine, avoid or recover preferences) and (H) (proceedings to determine, avoid or recover fraudulent transfers).

**I.      Count I – Alleged Preferential Transfer (11 U.S.C. § 547(b)).**

Section 547(b) of the Code provides that the trustee may avoid "any transfer of an interest of the debtor in property" that is:

(1)   to or for the benefit of a creditor;

(2)   for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3)   made while the debtor was insolvent;

---

Division.") Ultimately, the parties did not come to terms on an asset purchase agreement and Truland was forced to file for bankruptcy protection when it lost the confidence of its lenders, suppliers and sureties.

(4)  made—

(A)   on or within 90 days before the date of the filing of the petition; or

(B)   between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5)  that enables such creditor to receive more than such creditor would receive if—

(A)   the case were a case under chapter 7 of this title;

(B)   the transfer had not been made; and

(C)   such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The Debtor is statutorily presumed to be insolvent during the 90 days preceding the bankruptcy, and Myers does not raise a defense based on the Debtor's solvency. 11 U.S.C. § 547(f). The Trustee testified, without contradiction, that the payment to Myers will enable it to receive substantially more than it will receive as an unsecured creditor in the Chapter 7 liquidation of the Debtor. The issues to be resolved are: (a) whether Myers was a creditor of the Debtor at the time of the transfer; (b) whether the joint check was property of the Debtor's estate; and (c) whether Myers has met its burden of proof in establishing that there was a contemporaneous exchange for new value under Section 547(c)(1) of the Code.

A.   Was Myers a Creditor?

Section 547(b) allows the Trustee to avoid transfers "to or for the benefit of a creditor," "for or on account of an antecedent debt." 11 U.S.C. § 547(b)(1)-(2). Myers argues that it had no contract directly with the Debtor, and therefore cannot be considered to be a creditor. The term "creditor" is defined as one with a claim against the Debtor. 11 U.S.C. § 101(10)(A). The term claim is defined broadly as any right to payment, whether "liquidated, unliquidated, fixed,

contingent, matured or unmatured, disputed, undisputed, legal, equitable, secured or unsecured."

11 U.S.C. § 101(5)(A).[5] The Trustee argues that Myers was a creditor of TWST at the time of

the payment because Myers would have had a claim in quantum meruit against TWST for the

value of the equipment it delivered on May 27 and June 18, 2014, and for which Myers was not

paid until July 11, 2014.

The first issue to be decided here is what law applies. The cases indicate that a quantum

meruit claim is in the nature of a contract and, therefore, the Court will look to the place of

contracting to determine whether or not Myers would have had a claim against TWST at the time

of the payment. *Precision Pipeline, LLC v. Dominion Transmission, Inc.,* No. 3:16-cv-00180,

2017 WL 1100903, *5 (E.D. Va. Mar. 23, 2017); *Scott & Stringfellow, LLC v. AIG Commercial

Equip. Fin., Inc.,* No. 3:10cv825-HEH, 2011 WL 1348324, *4 (E.D. Va. Apr. 8, 2011). Another

case holds that it is the place of performance that governs issues of breach. *EDI Precast, LLC v.

Mid-Atlantic Precast,* LLC, No. 3:12-cv-00012, 2012 WL 2343033, *2 (W.D. Va. Jun. 20,

2012). These legal principles, though, are easier stated than applied.

Myers is located in Ohio. TWST's offices were in Virginia. The equipment was delivered

to sites in both Virginia and D.C. Def. Ex. R. Clark's corporate offices are located in Maryland.

The Orange and Blue Lines run through Virginia, D.C. and Maryland. All of the parties'

communications were sent or received by e-mail, from their respective offices, so the place of

contracting is not clear. Employing the place of performance analysis, the Court concludes that

either D.C. or Virginia law governs whether or not Myers had a quantum meruit claim because

---

[5]  Myers' position here is inconsistent with its position that the Clark-TWST Subcontract created a trust for its
benefit, discussed below. Where there is a trustee-beneficiary relationship and the trustee (here, TWST) defaults in
its fiduciary duties, the beneficiary has a claim for damages against the trustee. *See* 11 U.S.C. § 523(a)(4)
(nondischargeability of claims for defalcation while acting in a fiduciary capacity).

the equipment was delivered for use in D.C. and in Virginia. In the end, the Court finds that the

law on quantum meruit in D.C. and Virginia is not materially different for purposes of this case.

Under Virginia law, Myers would have a claim in quantum meruit where: (1) it conferred

a benefit on TWST; (2) there was knowledge on the part of TWST of the benefit conferred; and

(3) TWST accepted or retained the benefit in circumstances that would render it inequitable for

TWST to retain the benefit without paying for its value. *Centex Constr. v. Acstar Ins. Co.,* 448

F.Supp.2d 697, 707 (E.D. Va. 2006) (citing *Nossen v. Hoy,* 750 F.Supp. 740, 744–45 (E.D. Va.

1990)). Although, generally, the existence of an express contract will preclude a claim for

quantum meruit (*Artistic Stone Crafters v. Safeco Ins. Co.,* 726 F.Supp.2d 595, 604 (E.D. Va.

2010); *Centex Constr.,* 448 F.Supp.2d at 707), in this case there was no contract directly between

TWST and Myers – Myers' contract was with NES. The Fourth Circuit has rejected a *per se* rule

that would preclude a quantum meruit claim where the claimant has contracted with a third party

on the same subject matter. *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.,* 961

F.2d 489, 493 (4th Cir. 1992) ("This authority, with which we agree, permits implied contract

claims to be brought even though an express contract concerning the same subject matter exists

between the claimant and a third party.") (citing *Avery v. Sielcken-Schwarz,* 5 N.J. Super. 195, 68

A.2d 635, 637 (1949) ("Defendant leans heavily on the rule that the existence of an express

contract excludes an implied contract. That rule has full effect only when the parties to the express

contract are the same as the parties to the action")); *see also Datastaff Tech. Group, Inc. v. Centex

Constr. Co., Inc.,* 528 F.Supp.2d 587, 599 (E.D. Va. 2007) ("[W]hile 'the existence of an express

contract between A and B undermines a quantum meruit claim between A and C for those same

services,' summary judgment on this claim is improper on the current record . . . ")

Similarly, under D.C. law, to recover on a claim for quasi contract or unjust enrichment, the claimant must demonstrate: (1) that it rendered valuable services; (2) for the person against whom the recovery is sought; (3) which were accepted and enjoyed by that person; and (4) under circumstances which reasonably notified the person that the claimant expected to be paid. *Providence Hosp. v. Dorsey*, 634 A.2d 1216, 1218 fn. 8 (D.C. 1993). Further, the existence of an express contract with a third party will not necessarily bar a claim for quantum meruit under D.C. law. *Intelect Corp. v. Cellco P'ship GP,* 160 F.Supp.3d 157, 191-92 (D. D.C. 2016) ("The principle that a contract between the parties will bar an implied-in-fact contract or unjust enrichment claim applies only where those claims are brought *among the contracting parties"*); *see also Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 64-65 (D.C. 2005) ("The equities may be quite different, however, where A, who claims that B has been unjustly enriched at A's expense, has a contract with C rather than with B. It is not at all clear to us that in such a situation, the existence of a contract with C should automatically bar A's claim of unjust enrichment against B.") The Court concludes, therefore, that there is no material difference between Virginia law and D.C. law for purposes hereof.

Under the Restatement (Third) Restitution:

> If the claimant renders to a third person a contractual performance for which the claimant does not receive the promised compensation, and the effect of the claimant's uncompensated performance is to confer a benefit on the defendant, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment.

*Id.*, § 25(1).

The Comments provide the following example:

> Owner contracts with A to construct a building. A subcontracts part of the work to B. B in turn subcontracts part of its work to C. C performs under its contract; B defaults and becomes insolvent. C has not been paid by either B or A. A has been paid in full by Owner, but A has paid no one for the work done by C. C has a claim against A under this section for the value of its performance.

11

*Id.*, Illus. 15.

In this case, Myers conferred a benefit on TWST: it delivered the equipment for which TWST was contractually obligated to deliver to Clark. TWST clearly knew of the delivery of the equipment at all times. It was intimately involved in the negotiations that resulted in the JCA. The benefits – the delivery of the equipment – were accepted by TWST. And, certainly Myers delivered the equipment with the expectation of being paid and TWST had the same expectation, that Myers would be paid.

The Clark-TWST Subcontract would not bar a claim in quantum meruit for the reasons stated above. Although in the Illustration above, "A" is the general contractor (here, Clark), the Court does not see why the same principal would not apply to a first-tier subcontractor (TWST) occupying the position of A. If Clark had paid TWST directly without the JCA, or had Clark not paid for the equipment at all, Myers would have had a claim against TWST in quantum meruit for the value of the equipment it delivered as of the two dates of delivery. The point here is not that Myers had an inarguable claim against TWST. The point is that Myers had a claim in quantum meruit against TWST that may have been "contingent," "disputed," "unmatured" or "equitable" within the broad definition of a claim under Section 101(5)(A) of the Bankruptcy Code.

The Court finds that Myers was a creditor with a claim against TWST for quantum meruit at the time that the transfer was made on July 11, 2014.

B. *Do the Proceeds of the Check Constitute Property of the Estate?*

Section 547(b) allows the Trustee to avoid transfers of the debtor's interest in property. 11 U.S.C. § 547(b). Section 541(d), on the other hand, provides that property to which the debtor has bare legal title, held in trust for another, is not property of the estate. 11 U.S.C. § 541(d); *Old*

*Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron),* 155 F.3d 718, 721-22 (4th Cir.1998)

("[W]hen a 'debtor does not own an equitable interest in property he holds in trust for another,

that interest is not 'property of the estate' for purposes of the Bankruptcy Code.") (citing *Begier

v. IRS,* 496 U.S. 53, 59 (1990)). This principle limits the ability of a trustee to avoid transfers of

property that the debtor held in trust for another. *See, e.g., Holmes Envtl., Inc. v. SunTrust Banks,

Inc., et al. (In re Holmes Envtl., Inc.),* 287 B.R. 363, 382 (Bankr. E.D. Va. 2002) ("Here the

funds in the escrow account representing the monies earned by the performance of Hazmed on

the Corps Contract are not estate property; therefore, no preference can occur.")

Myers makes two arguments as to why the proceeds of the joint check were not property

of the estate.

### (i)     The Clark-TWST Subcontract.

Myers argues first that the flow down provision contained in the Clark-TWST

Subcontract created a trust for its benefit. The Court finds, however, that the flow down

provision in the Clark-TWST Subcontract lacks the characteristics of a trust. *See Racetrac

Petroleum, Inc. v. Khan (In Re Khan),* 461 B.R. 343, 348 (E.D. Va. 2011) (three primary indicia

of an intent to create a trust: (a) the designated trustee lacks legal title to the property; (b) the

trustee is restricted in its use of the property; and (c) the property remains separate from the

trustee's own property) (citing *In re Strack*, 524 F.3d 493, 499 (4th Cir. 2008)). The flow down

provision in the Clark-TWST has none of these attributes.

Absent the JCA, the funds indisputably would have been TWST's property upon receipt.

There was no requirement in the Subcontract for the segregation of the funds. A violation of the

flow down provision by TWST would have given rise to an ordinary breach of contract claim by

Clark and nothing more.

13

The flow down provision in the Clark-TWST Subcontract did not create a trust.

*(ii)    The Joint Check Agreement.*

Myers' second argument in favor of a trust relies on the JCA and the Fourth Circuit's

decision in *Mid-Atlantic Supply, Inc. of Virginia v. Three Rivers Aluminum Co.,* 790 F.2d 1121

(4th Cir. 1986). The *Mid-Atlantic* case involved a dispute between a lower-tier supplier

(TRACO) and a lender with a security interest in the Debtor's accounts receivable (United

Virginia Bank). TRACO sought relief from the automatic stay with respect to a joint check

payable to TRACO and the Debtor. *Id.* at 1122. The Court granted the motion and the Debtor

appealed. The case was then converted to Chapter 7, and the Chapter 7 Trustee abandoned any

interest in the check. United Virginia Bank then moved to intervene, claiming a security interest

in the check and its proceeds. *Id.* at 1123. The bankruptcy court held in favor of TRACO, and the

Bank appealed. *Id.*

The Fourth Circuit held that under the joint check arrangement the Debtor "had not the

slightest interest in the check," and that there was a constructive trust in favor of TRACO. *Id.* at

1127. The Fourth Circuit described the Debtor's (Mid-Atlantic's) position as that of a "mere

conduit," under which its function "was solely to indorse the joint check and pass it on to

TRACO as TRACO's property." *Id.* Although the *Mid-Atlantic* case involved a dispute between

a supplier and a secured party, its holding has been applied in the context of preference cases.

*See e.g., In re Railworks Corp.,* 387 B.R. 156, 164-67 (Bankr. Md. 2008); *In re Diamond K

Corp.,* No. 04-50356, 2007 WL 2229727, at *4 (Bankr. E.D. Tex. 2007).

The Trustee responds to the *Mid-Atlantic* joint check argument by asserting that the JCA

itself was executed on June 9, 2014, and became effective on or about June 16, 2014, within the

90-day preference period. The Trustee cites *In re R.J. Patton Co., Inc.,* 348 B.R. 618 (Bankr. D.

Conn. 2006), and *In re Buono,* 119 B.R. 498 (Bankr. W. D. Pa. 1990), for the proposition that

where a joint check agreement is entered into within the 90 days, the agreement is a preference.

*See Patton*, 348 B.R. at 625 ("When the Defendant signed the JPA's and simultaneously

accepted the Joint Checks, the Debtor's interest in the Receivables was transferred to the

Defendant and that *was* a transfer of property of the Debtor within the preference period"); *see

also Buono*, 119 B.R. at 501 n.1. Here, the Trustee has the better argument. There was no joint

check arrangement from the outset of the parties' dealings. The parties entered into the JCA after

TWST was in material default, after TWST was deeply out of trust with its suppliers, after Myers

refused to release the equipment, and within the 90-day preference period. Myers unquestionably

improved its position when it entered into the JCA with Clark and the Debtor.

The JCA fits comfortably within the definition of a "transfer," in that it was a "mode,

direct or indirect, absolute or conditional, voluntary or involuntary of disposing of or parting

with – (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). Myers' position is

that TWST parted with all interest in the proceeds of the check when it entered into the JCA.

The Court does not see how a preference (the JCA) can save a preference (the payment).

The Court finds that the JCA and the joint check issued pursuant to that agreement constitute a

preference – subject to Myers' contemporaneous exchange for new value defense, discussed

below. The Court, therefore, finds that the joint check was property of the Debtor's estate.[6]

## II.    Myers' Defense Under Section 547(c)(1) (Substantially Contemporaneous Exchange for New Value).

Section 547(c)(1) provides a defense to preference liability where the transfer is a

substantially contemporaneous exchange for new value. 11 U.S.C. § 547(c)(1). Section 547(c)(1)

---

[6] Myers also argues that there was no antecedent debt for purposes of Section 547(b)(2). The Court views this argument to be indistinguishable from the argument that Myers was not a creditor of TWST, addressed above.

is intended "'to encourage creditors to continue to deal with troubled debtors' by 'prevent[ing] trustees from avoiding payments that were clearly intended to support a new transaction, instead of an antecedent debt.'" *In re ESA Envtl. Specialists, Inc.,* 709 F.3d 388, 397-98 (4th Cir. 2013) (quoting *United Rentals, Inc. v. Angell (In re United Rentals),* 592 F.3d 525, 529 (4th Cir. 2010)). The party asserting the new value defense has the burden of proof. *Id.* The key question is "whether the alleged preferential transfer diminished the debtor's estate, i.e., whether the debtor in fact acquired a new asset that offset the loss in value to the estate when the debtor transferred existing assets to acquire the new asset at issue." *Id.* at 398.

Myers posits that it is entitled to the new value defense in two ways: (a) the alleged release of its bond claim against Zurich; and (b) the release of the equipment that it was holding prior to the payment. The Court will examine both claims.

A.   *Myers' Alleged Release of its Bond Claim.*

Myers first claims that it released a bond claim against Zurich, which benefited the Debtor. *See GEM Constr. Corp. of Virginia*, 262 B.R 638, 652 (Bankr. E.D. Va. 2000). As noted above, though, Myers began investigating making a bond claim against the surety bond, but it never actually made a bond claim. Rather, the parties – including Zurich – entered into the JCA, thereby making any claim under the bond unnecessary.

The situation, then, is indistinguishable from *United Rentals* where the Fourth Circuit rejected a new value defense based on the release of "inchoate" rights to make a bond claim. 592 F.3d at 532 ("Since United never even attempted to make any claim on the bond here, the Surety never obtained any lien that it could release.")  The Court finds that Myers never actually made a bond claim, and, therefore, did not release a bond claim as new value to the Debtor.

16

B.  *Myers' Delivery of the Equipment.*

Myers argues in the alternative that it provided new value based on the release of the

equipment. Myers released equipment with a value of $1,819,206.31, plus Overhead/Profit of

$181,920.63, on May 27, 2014, in anticipation of the JCA and the delivery of a joint check from

Clark. Def. Ex. R, at 00001123. It released an additional $261,667.00 in equipment on June 18,

2014, plus Overhead/Profit of $26,166.70. *Id.* at 00001268.

The Trustee argues that the evidence fails to establish that the parties mutually intended

the release of the equipment to be a substantially contemporaneous exchange for new value. *See*

11 U.S.C. § 547(c)(1)(A) ("[T]o the extent that such transfer was intended by the debtor and the

creditor . . . to be a contemporaneous exchange for new value"). The parties' intent may be

"gleaned from, *inter alia,* 'the agreement or the course of dealings between the parties.'" *In re*

*Holmes Environmental, Inc.,* 287 B.R. 363, 385 (Bankr. E.D. Va. 2002) (quoting *Everlock*

*Fastening Sys., Inc. v. Health All. Plan (In re Everlock Fastening Sys., Inc.),* 171 B.R. 251, 255

(Bankr. E. D. Mich. 1994)). It is clear in this case that Myers had no intention of releasing its

equipment without the JCA being put into place. It released the equipment with the full

expectation that Clark would issue a joint check. The Court finds that the evidence of the parties'

intent, through the e-mail exchanges that took place in anticipation of the JCA, establishes a

mutual intent to create a substantially contemporaneous exchange for new value. Def. Ex. M

(Hinton e-mails, Apr. 28, 2014 and Apr. 29, 2014).

Was the exchange in fact substantially contemporaneous? *See* 11 U.S.C. § 547(c)(1)(B)

("[I]n fact a substantially contemporaneous exchange"). The Court finds that it was not. The

"substantially contemporaneous" standard is a flexible one, requiring the Court to take into

account the particular facts and circumstances of each case. *In re Genmar Holdings, Inc.,* 776

17

F.3d 961, 964 (8th Cir. 2015) (citing *In re Dorholt*, 224 F.3d 871, 874 (8th Cir. 2000) (quotation omitted)); *In re Hedrick*, 524 F.3d 1175, 1190 (11th Cir. 2008).

Other courts have found the delivery of goods to be substantially contemporaneous where the goods are delivered within roughly two weeks of the transfer. *Pine Top Ins. Co. v. Bank of America Nat. Trust & Sav. Ass'n,* 969 F.2d 321, 328 (7th Cir. 1992) (delay of two to three weeks); *In re Payless Cashways, Inc.*, 306 B.R. 243, 252 (8th Cir. B.A.P. 2004) (payment for goods by EFT within 15 days of delivery); *Matter of Anderson-Smith Assocs.,* 188 B.R. 679, 689 (Bankr. N.D. Ala. 1995) (nine-day delay; "A transaction can be substantially contemporaneous even where there is some separation between the events of the extension of new value and the transfer by the debtor") (citing *In re Kiddy Toys, Inc.*, 178 B.R. 928, 936 (Bankr. D. P.R. 1994)).

Somewhat longer periods of time, on the other hand, have been held not to be substantially contemporaneous. *In re Furr's Supermarkets, Inc.,* 485 B.R. 672, 738 (Bankr. N.M. 2012) (checks for insurance premiums provided "at least two months" after coverage provided by insurer deemed not substantially contemporaneous); *In re Interstate Bakeries Corp*., No. 04-45814, 2012 WL 6614969, at * 5 (Bankr. W.D. Mo. Dec. 19, 2012) (average delay of 31 days not substantially contemporaneous); *In re Messamore*, 250 B.R. 913 (Bankr. S.D. Ill. 2000) (delay of 50 days not substantially contemporaneous); *In re McLaughlin*, 183 B.R. 171, 176 (Bankr. W.D. Wis. 1995) (32 days from attachment to perfection of a security interest not substantially contemporaneous); *In re Freestate Management Services, Inc*., 153 B.R. 972, 984 (Bankr. D. Md. 1993) (delay of 24 days not substantially contemporaneous); *In re Arctic Air Conditioning, Inc.,* 35 B.R. 107, 109 (Bankr. E. D. Tenn. 1983) (30 days not substantially contemporaneous).

18

In this case, the vast majority of the equipment ($1,819,206.31) was released on May 27th, 45 days (over six weeks) before the payment on July 11th by joint check. The lesser amount of equipment ($261,667.00) was released on June 18th, 23 days (three weeks and two days) before the joint check was issued on July 11th. The Trustee is correct in his argument that the execution of the JCA was a preference, so Myers cannot rely on the JCA as a defense under *Mid-Atlantic*. The Court finds that a gap of 45 days, and a gap of 23 days, are simply too long to be considered truly "contemporaneous" under Section 547(c)(1).

For these reasons, the Court finds that Myers has not established a defense to liability under Section 547(c)(1) of the Code.

## III.    The Remaining Counts in the Complaint.

The remaining Counts in the Complaint are: Count IV (Recovery of Property – 11 U.S.C § 550), Count V (Preservation of Avoidance – 11 U.S.C. § 551), and Count VI (Disallowance of Claim – 11 U.S.C. § 502(d)).[7]

Count IV (Recovery of Property – 11 U.S.C. § 550) follows the Trustee's avoidance claim on Count I, above. The Court will grant judgment to the Trustee on Count IV for the value of what was transferred, $2,107,039.86, plus pre-judgment interest from the filing of this adversary proceeding on July 21, 2016. *See In re Cybermech, Inc.,* 13 F.3d 818, 822-23 (4th Cir. 1994) (allowing pre-judgment interest); *Phoenix American Life Ins. Co. v. Devan*, 308 B.R. 237, 242-43 (D. Md. 2004); *In re ContinuityX, Inc.,* 569 B.R. 29, 40 (Bankr. S.D. N.Y. 2017) (awarding pre-judgment interest is discretionary and should be awarded unless sound reason not to).

---

[7]  Count II (Constructively Fraudulent Transfer – 11 U.S.C. § 548(a)(2)(B)) and Count III (Post-petition Transfer – 11 U.S.C. § 549) previously were dismissed. *See* Order Granting in Part and Denying in Part Summary Judgment, Docket No. 46.

Given the judgment on Counts I and IV, there is no need for the preservation of an avoided transfer under Section 551. Count V (Preservation of Avoidance – 11 U.S.C. § 551) will be dismissed. *In re Early*, No. 05-01354, Adv. No. 05-10079, 2008 WL 2073917, *3 (Bankr. D.C. May 12, 2008) ("[T]he remedies are mutually exclusive: a trustee may not both recover the lien via automatic preservation under § 551 and recover a monetary judgment for the value of the lien") (citing *Lindquist v. Household Indust. Fin. Co. (In re Vondall),* 352 B.R. 193, 200 (Bankr. D. Minn. 2006), *aff'd*, 364 B.R. 668 (B.A.P. 8th Cir. 2007)).

Finally, Myers did not file a proof of claim in the TWST case. Count VI (Disallowance of Claim – 11 U.S.C. § 502(d)), therefore, will be dismissed.

## Conclusion

For the foregoing reasons the Court will enter a separate Order under which:

A.      The Court will grant judgment to the Trustee on Count I (Preference – 11 U.S.C. § 547(b)) and Count IV (Recovery of Property – 11 U.S.C § 550), in the amount of $2,107,039.86, plus pre-judgment interest at the federal judgment rate from the date of the filing of the Trustee's Complaint on July 21, 2016.

B.      The Court will dismiss Counts V and VI.

C.      The Clerk will mail copies of this Opinion and the accompanying Order, or will provide cm-ecf notice of their entry, to the parties below.


Date: _Jul 23 2018_____          /s/ Brian F. Kenney

                                            _____

                                            Brian F. Kenney

Alexandria, Virginia                        United States Bankruptcy Judge


                                            Entered on Docket: July 25, 2018


20

Copies to:

H. Jason Gold
101 Constitution Avenue, N.W., Suite 900
Washington, D.C. 20001
*Chapter 7 Trustee*

Dylan G. Trache
101 Constitution Avenue, N.W., Suite 900
Washington, D.C. 20001
*Counsel for the Plaintiff*

Jennifer McLain McLemore
909 East Main Street, Suite 1200
Richmond, VA 23219
*Counsel for the Defendant*

James M. McHugh
220 Market Avenue, South, Eighth Floor
Canton, Ohio 44702
*Counsel for the Defendant*